UNITED STATES of America,
Plaintiff,

v.

HEALTHCO, INC., Defendant.
No. 70 Civ. 1312.

United States District Court,
S. D. New York.
Jan. 14, 1975.

John Sirignano, Jr., Melvin Lublinski, Edwin Weiss, Roberto Boneta, Norman H. Seidler, Bernard Wehrmann, Dept. of Justice, for plaintiff.

Earl A. Jinkinson, James V. Demarco, Winston & Strawn, Chicago, Ill., Thomas Wm. Bianchi, Washington, D. C., for defendant.

WYATT, District Judge.

This is the decision after trial to the Court without a jury of this civil antitrust action.

The United States commenced the action on April 2, 1970, charging a violation of Section 7 of the Clayton Antitrust Act (15 U.S.C. § 18; the Act). At that time, the name of defendant was "Healthcare Corporation". About August 1971, the name was changed to "Healthco, Inc."; defendant will be referred to as "Healthco".

The complaint charges that Healthco, while engaged as a dental dealer in the sale of dental products in "Metropolitan New York", acquired substantially all of the assets of four other dental dealers and that this was in violation of Section 7 of the Act. That section forbids a corporation to acquire "any part of the assets of another corporation . . . where in any line of commerce in any section of the country, the effect of such

acquisition may be substantially to lessen competition, or to tend to create a monopoly".

Specifically, the complaint avers (paras 20–24) that the effect of the following acquisitions by Healthco may be substantially to lessen competition or tend to create a monopoly in the dental products market:

(1) General Dental Supply Co. Inc. (General) on May 9, 1969;

(2) M. A. Sechter Dental Equipment and Supply Co. Inc. (Sechter) on June 20, 1969;

(3) Hebard-Metro Dental Company, Inc. (Hebard-Metro) on November 15, 1969; and

(4) Hebard Dental Supply Company, Inc. (Hebard Dental) on November 15, 1969.

The government asks that each of these acquisitions be declared in violation of the Act and that Healthco be required to divest itself of each of them. It is concluded that because of their effect in the submarket of dental equipment, the four acquisitions were in violation of the Act.

On April 20, 1970, plaintiff sought a preliminary injunction under Section 15 of the Act (15 U.S.C. § 25) and Fed.R. Civ.P. 65(a):

(a) requiring that during the pendency of this action the challenged acquisitions be maintained separate and independent from Healthco and from each other;

(b) enjoining Healthco from taking any other action during the pendency of this litigation, that would impair its ability to comply with an order of divestiture in whole or in part of its interest in such companies; and

(c) enjoining Healthco during the pendency of this litigation from acquiring the stock or assets of any dental dealer in Metropolitan New York.

On July 16, 1970, an order agreed to by the parties allowed the motion for a preliminary injunction to be withdrawn but granted in substance the preliminary relief sought.

On May 3, 1971, Healthco moved for an order permitting it "to merge into itself, its subsidiary dental supply corporations in the New York Metropolitan area which are referred to in this action".

The motion was granted by order of May 25, 1971. The mergers were to be without prejudice to the application of any final order of divestiture in this action.

Proposed findings of fact and conclusions of law, along with post-trial briefs, have been submitted by the parties. What follow are the findings of fact and conclusions of law of this Court.

1.

Dental products consist of four categories of products: (1) dental equipment (equipment), (2) dental sundries (sundries), (3) artificial teeth, and (4) dental precious metals. Only the first two categories, equipment and sundries, are here involved.

Dental products are a recognized class of products or line of commerce within the dental industry.

Equipment consists of durable dental products used by dentists. Examples of equipment are dental chairs, dental units, X-ray machines, sterilizers, lights, cabinets, and darkroom equipment.

Equipment is a recognized submarket of the dental products market or line of commerce.

Sundries consist for the most part of non-durable consumable products such as materials for fillings, anesthetics, impression materials, waxes, cements, dental chemicals, nonprecious metals and dental burrs. Sundries are also considered to include some durable products, for example, small instruments of under $100 in value. There are upwards of 20,000 different items which are classified as sundries within the dental products industry.

Dental sundries is a recognized sub-market of the dental products market or line of commerce.

## 2.

Dental products are distributed and sold almost entirely by companies classified by the United States Department of Commerce as "merchant wholesalers—dental supplies" or "merchant wholesalers—professional equipment and supplies". These "merchant wholesalers" have been referred to by the parties as "dental dealers" and this term is used herein.

Dental dealers sell dental products to dentists, dental laboratories, institutions (including hospitals and dental schools), and government agencies (collectively, sometimes called hereafter "dental customers").

There are two principal types of dental dealers—full line dealers and non-full line dealers.

A full line dealer sells equipment, sundries, precious metals and artificial teeth. A full line dealer arranges for the installation and servicing of equipment sold. The full line dealer sells all the dental items needed by dentists or dental laboratories.

Non-full line dealers are generally dealers who do not sell equipment and do not install or furnish services for equipment. These dealers concentrate on the sale of a broad line of sundries.

Between a full line dealer and a non-full line dealer as described, there are various dealers who sell sundries, equipment, and services for equipment, but who do not sell artificial teeth and precious metals. Dealers offering equipment and services for equipment without a line of sundries are very rare in the market.

Dealers who sell equipment offer the following services to their customers: assistance of equipment specialists to aid dentists in planning the layout of their office; equipment mechanics to install large equipment; equipment repairmen who are able to visit the dentist or the laboratory; and management advice to dentists.

Nearly all dental dealers have salesmen who solicit sales personally from their regular customers. These salesmen make dental customers aware of new products and innovations in the dental industry.

Dealers generally fill their orders, particularly sundries, within two to five days of their receipt from salesmen. Delivery to the customers is usually by parcel post. Short term credit is available to customers.

Dentists, when opening an office, require the services of a dental dealer.

The impact of dental dealers is most significant on dentists, rather than on the other dental customers.

There are two major professional organizations of dental dealers: American Dental Trade Association (ADTA; which also has dental product *manufacturers* as members) and Dental Dealers of America (DDA).

It is moderately difficult to start a dental dealer business.

To be a full line dealer requires a minimum capital investment of $30,000 for equipment inventory and $20,000 for an adequate inventory of sundries; in addition, there must be working capital, and a physical plant.

A trained sales force, with specialists in the marketing, installation and repair of equipment, is necessary.

Difficulty is encountered in obtaining product lines from manufacturers.

## 3.

Mail order houses are companies which solicit sales of dental products through advertising in trade publications or their own catalogues sent to dental customers. They generally offer the same line of dental products as a non-full line dental dealer. They generally sell a full line of sundries.

While some items of equipment are sold by mail order houses, these are generally of the smaller type and such sales

are not a significant factor in the equipment market.

Mail order houses maintain large inventories of dental products and sell at prices lower than those of dental dealers. They accept orders primarily by mail and in some cases by telephone. They do not rely on salesmen for the solicitation of orders.

Mail order houses offer delivery services and credit terms on a basis comparable to those offered by non-full line dealers. They do not offer, however, any of the special services of a full line dealer; for example, they do not install or repair equipment.

The impact of the mail order houses is of increasing significance in the dental products industry. This impact is largely in the submarket of sundries.

Mail order houses purchase their products from manufacturers and to some extent from larger dental dealers, such as Healthco.

#### 4.

Manufacturers of dental products are the prime suppliers of dental dealers and mail order houses.

Manufacturers play a significant part in the competitive aspects of the dental industry by control of the number of dental dealers which can sell in a given area. This factor appears strongest in the equipment market.

Dental dealers first entering a given geographic area have difficulty in obtaining access to manufacturers' product lines.

House brands are products made by the manufacturer for sale under private labels of the dental dealer.

Manufacturers make some direct sales to dental customers. These sales are not significant to dentists, but are concentrated to government, institutions and dental laboratories.

Manufacturers generally specialize in a specific type of product rather than in a broad line of dental products for sale to dental dealers.

Manufacturers do not install or supply services for equipment. However, installation and repair services are available from independent companies specializing in such services.

#### 5.

The Metropolitan New York Area ("the Area") is made up of the following: New York City, the Counties of Westchester, Rockland, Nassau, and Suffolk in New York State, and the Counties of Bergen, Essex, Hudson, Passaic, Union, Morris, Somerset, and Middlesex in New Jersey.

#### 6.

Rower Dental Supply Co. (Rower) was a Boston based dental dealer. Rower entered the dental industry in the Area by purchasing the assets of three S. S. White Co. dental dealer outlets. S. S. White Co., a large nationwide manufacturer and wholesaler of dental products, was required by an antitrust consent decree to divest itself of certain dental dealer companies. It sold three dental dealers in New York City to Rower, which took over the operations on January 1, 1969.

Rower, in January 1969, also acquired the assets of National Dental Supply Co. (National), a dental dealer partnership with a single outlet in New York City.

#### 7.

Defendant Healthco at some time in early 1969, after January of that year, bought all of the stock of Rower; Healthco thus entered the dental industry in the Area by acquiring the dental dealer businesses formerly operated by the three S. S. White outlets and by National.

The government does not challenge the purchase by Healthco of Rower.

#### 8.

Healthco is a Delaware corporation which has its principal place of business in Boston and which transacts business in the Southern District of New York. It is engaged in interstate commerce.

On January 2, 1968, Healthco commenced doing business under the name of North American Nursing Homes, Inc. At that time, its business was limited to the maintenance of patient care facilities. In November 1968, the name of the corporation was changed to Healthcare and as already noted the name was further changed to Healthco, Inc. in about August 1971.

Healthco became engaged in the sale of dental and medical supplies and equipment, and the operation of dental laboratories.

Since January 1, 1969, Healthco has acquired about 30 dental dealers throughout the nation. It now has 59 dental dealer companies in 28 states, the District of Columbia, and Canada. Sales of these dental dealers were in excess of 38 million dollars in 1968, and 42.8 million dollars in 1969.

Healthco purchases in sufficient volume from manufacturers to obtain house brands.

Healthco as a nationwide chain of dental dealers has ready access to manufacturers' product lines, and can purchase a large volume of products at favorable prices.

## 9.

The government here challenges the four dental dealer acquisitions by Healthco which were set out at the beginning of this opinion, namely, General, Sechter, Hebard-Metro, and Hebard Dental. It is not disputed that the acquisitions were made by Healthco as averred in the complaint.

General had a single outlet in New York City; Sechter operated two outlets, one in New York City and one in New Jersey; Hebard-Metro had an outlet in Syosset, Long Island; and Hebard Dental had an outlet in White Plains, New York.

The four dental dealers thus acquired by Healthco were all in the Area and all were, and continue to be, full line dental dealers. At the time of their acquisition, they were all engaged in interstate commerce and transacted business in the Southern District of New York.

## 10.

In 1968, *before* their acquisition by Healthco, the dental dealers later acquired (S. S. White three outlets, National, and the four just described) had sales in the Area as follows: all dental products—$9,239,000; equipment—$3,703,000; and sundries—$4,282,000.

In 1969 (the year of their acquisition by Healthco) the same dental dealers had sales in the Area as follows: all dental products—$9,847,000; equipment—$3,799,000; and sundries—$4,923,000.

In 1970, the same dental dealers had sales in the Area as follows: all dental products—$9,553,000; equipment—$3,667,000; and sundries—$4,873,000.

Since 1968 no new full line dental dealer has entered the market in the Area and only two insignificant non-full line dental dealers have entered that market.

## 11.

The government made a survey of dental dealers and mail order houses selling in the Area for the years 1968, 1969, and 1970. Questionnaires were sent to dental dealers and to mail order houses. Among other things, these asked for the dollar volume of sales in the Area of equipment and of sundries. The government relies heavily on the responses.

For 1968, there were responses: (a) from 55 dental dealers; and (b) from nine mail order houses, of which five were based in the Area and four were based outside the Area.

For 1969, there were responses: (a) from 50 dental dealers; and (b) from nine mail order houses, of which five were based in the Area and four were based outside the Area.

For 1970, there were responses: (a) from 51 dental dealers; and (b) from nine mail order houses, of which five were based in the Area and four were based outside the Area.

Of the dental dealers responding, about 28 were non-full line dealers.

Of the dental dealers responding, between 22 and 26 were full line dealers.

Questionnaires were sent to all dental dealers in the Area which belonged to DDA.

Questionnaires were sent to all dental dealers in the Area which belonged to ADTA. Dental dealers belonging to ADTA are estimated to account for 66% of the sales of dental products by all such dealers.

The government's survey covered all dental dealers in the Area which are of any significance. The dealers surveyed sell the overwhelming amount of their products within the Area.

Questionnaires were not sent to all mail order houses in the Area selling to dental customers in the Area.

Questionnaires were not sent to all mail order houses outside the Area selling to dental customers within the Area.

No evidence was introduced by Healthco to show the volume of sales of dental products of those mail order houses not covered by the survey. It is doubted that any mail order houses not covered by the survey sold in any year dental products for more than $100,000. No competitor of any significance in the Area was missed by the survey. In any event, sales of mail order houses which were missed by the survey would have slight meaning in the sundries submarket and no meaning in the equipment submarket.

The government made a special survey of *manufacturers* of dental products who sold such products to dental customers in the Area for the years 1968, 1969, and 1970. Questionnaires were sent to all such manufacturers as were identified by Healthco in answers to interrogatories. Responses were received from more than 80 manufacturers. These showed sales by manufacturers to dental customers in the Area as follows: 1968—$4,850,873; 1969—$5,451,005; and 1970—$6,020,315.

12.

The government contends that the four challenged acquisitions by Healthco violate Section 7 of the Clayton Act (15 U.S.C. § 18) because their effect may be "substantially to lessen competition, or to tend to create a monopoly" in the sale of dental products in the Area.

The "line of commerce" for which the government contends is the sale of dental products by dental dealers. The Area is argued to be an appropriate "section of the country" for determining the effect of the acquisitions. Within the broad "line of commerce", the government argues that there are submarkets—equipment and sundries—in which the effect of the acquisitions may be measured. The theory of submarket measurement is based on the reasoning set forth in Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1961) and such later cases as United States v. Alcoa, 377 U.S. 271, 275–277, 84 S.Ct. 1283, 12 L.Ed:2d 314 (1964).

A further argument is made by the government that the unique cluster of products and services sold by dental dealers separates them as a specific "line of commerce" in which the probable effects of the acquisitions should be measured. This argument is based on the reasoning in United States v. Philadelphia National Bank, 374 U.S. 321, 355–357, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1962).

■ The government must show: that dental products are a "line of commerce"; that the Area is an appropriate "section of the country" for measurement of the probable effect of the acquisitions; and that the acquisitions may substantially lessen competition in the broad dental products line of commerce or in the equipment submarket or in the sundries submarket.

As already noted, the government relies heavily on its survey of the dental products market and on the statistical exhibits based thereon. The method employed in making the survey is described

in a memorandum opinion with order, filed December 18, 1973; the method was found to be proper and reliable.

Healthco contends that the line of commerce of dental products should include, in addition to those sellers surveyed by the government, all manufacturers and all mail order houses making sales of dental products to dental customers in the Area. It is argued by Healthco that the government has greatly underestimated the size of the dental products market and, therefore, has not shown that the four acquisitions may substantially lessen competition in any section of the country.

Healthco offers two main statistical theories to show that sales of dental products are far more than the government's figures set forth in Exhibits 32, 33, and 34.

The first theory involves the interpretation of data of the Census Bureau of the Department of Commerce for sales by "merchant wholesalers" in the Area.

The second theory involves a statistical analysis and projection by Mr. David Ellis, an expert statistician who testified for Healthco. Mr. Ellis sought to measure purchases by dentists (non-salaried) and dental laboratories located in the Area of dental products. This he did by relying on various trade reports and surveys. The method employed and its weaknesses are described in a memorandum opinion with order, filed December 18, 1973.

### 13.

There is no dispute about the products which make up the "line of commerce". "Dental products" is a term of commercial importance and meaning. Dental products are distinct in use from other medical and surgical products used in the field of health care; they are not interchangeable with these other products. While dental dealers do sell such generally useful articles as paper cups and office furniture (articles available from many sources), these are a relatively small part of total sales; the great bulk of dental products possess distinctive characteristics.

The delineation of a submarket requires study of the following criteria: recognition of the products in such submarket as separate economic entities; distinctive usage and characteristics of such products; distinctive prices; and specialized vendors.

In the dental products industry, there are at least two submarkets: sundries and equipment. These fit the criteria indicated.

Both submarkets are treated as separate entities within the industry for accounting purposes and for census purposes; customer recognition and uses of the separate products in these submarkets are clearly distinct.

Equipment is marketed by dental dealers through a separate department. Dental dealers employ personnel specializing in the sale and servicing of equipment; they employ managers and mechanics for equipment. Unlike sundries, the sale of equipment requires a specialized vendor, the dental dealer, to establish local personal contact and to provide service to the customer. It is difficult to sell equipment by mail.

In United States v. Alcoa, already cited, the dissenting opinion of Mr. Justice Stewart (in which two other justices joined) was highly critical of the finding by the majority of a submarket as a "line of commerce" (377 U.S. at 281–287, 84 S.Ct. 1283). The submarket found by the majority was aluminum conductor wire and cable within the broader line of commerce of aluminum *and copper* conductor wire and cable. See also, W. F. Upshaw, Relevant Market in Merger Decisions, 60 N.W.U.L. Rev. 424 (1965). These criticisms have no application to a finding of equipment and sundries as submarkets of the broader market for dental products, this because equipment and sundries are natural and accepted subdivisions within the dental products market and have the classical indicia of a submarket.

**14.**

The parties sharply contest both the number of sellers of dental products in the Area ("dental sellers") and the dollar volume of sales of dental products in the Area.

The government relies heavily on its statistical exhibits (Exs. 32–43) based on the responses to its questionnaires.

The statistical exhibits include responses of mail order houses as well as dental dealers. Government counsel seem thus to include mail order houses as dental dealers, which is inconsistent with definitions sometimes expressed by a government witness (SM 202) distinguishing between dental dealers and mail order houses. In any event, the broader the definition of dental sellers, the more reliable will be the government's statistical exhibits.

On the record as a whole, it is concluded that the government's statistical exhibits present a reasonably accurate picture of the competition in the two submarkets; it must be remembered that no precise and accurate statistics are available.

The government in its statistical survey could have included four types of dental sellers: (a) dental dealers (full line and non-full line) based within the Area; (b) dental dealers (full line and non-full line) based outside of the Area but making sales to dental customers within the Area; (c) mail order houses based within the Area; and (d) mail order houses based outside the Area but making sales to dental customers within the Area. These four types will be discussed in an effort to see if there are significant omissions from the government's statistical exhibits.

**(a)**

There were responses from 55 dental dealers used in the survey exhibits for 1968; from 50 dental dealers for 1969; and from 51 dental dealers for 1970.

The methods employed by the government to ascertain that this was a substantially complete covering of all dental dealers were reliable. The list of the dealers was compiled by Dr. Ritchin, a government economist, who constructed the questionnaires with his staff. They relied on the following source materials: membership directory of the DDA, 1968–69; ADTA membership list; answers to interrogatories by Healthco; and interviews with dental dealers selling within the Area. DDA and ADTA are the two organizations of dental dealers in the country. ADTA members make a significant percentage of sales of dental products by dental dealers; Mr. Ellis, a witness for Healthco, estimated that dealer members of ADTA account for two-thirds of dealer sales nationwide.

To show that the government has not covered accurately the dental dealers within the Area, Healthco relies on a segment of "Census of Business" (1967), a report prepared by the United States Department of Commerce. This report in relevant part seeks to define commodity lines for "merchant wholesalers" selling dental products from "establishments" located within the Area. These establishments specialize in the sale of dental products; general merchant wholesalers do not sell dental products to any significant degree. The "Census" report stated that there were 118 such establishments within the Area which sold "Dental Equipment Supplies". From this, Healthco argues that the 50–55 dental dealer responses used by the government represent an understatement of the number of dealers in the Area and, therefore, cause an understatement of the dollar volume of sales of relevant products.

It should first be pointed out that the number of "establishments" is not the number of "dental dealers". The Census of Business states that 'an establishment is not necessarily identical with the 'company' or 'enterprise' which may consist of more than one 'establishment' ". Census of Business figures represent a summary of reports for individual "establishments" rather than for companies. A separate report was ob-

tained for each location where the business of a company was conducted, including each location of multiunit organizations. Thus, every place of business of a dental dealer was considered a separate "establishment". Healthco's subsidiaries, for example, are listed as separate "establishments" in the "Census" reports, while the government exhibits treat each of them as one unit.

Within the term "establishments", the Census report includes firms that sell only to other wholesalers, importers selling merchandise at wholesale in the United States market, and exporters. These three categories are not shown to be competitors of any significance within the dental products market, and their exclusion from statistical exhibits is proper.

It is not conclusively established that the difference between the terms "dental dealer" and "establishment" is responsible for all of the difference between the Census of Business report and the government's statistical exhibits. Nevertheless, the careful effort made by the government to include all dental dealers within the Area compel a conclusion that there are no significant omissions from the government's dental dealer figures. Moreover, Healthco has not suggested the name of a single full line or non-full line dental dealer in the Area which was not included in the government's statistical exhibits.

### (b)

The second of the four types of dental sellers is the dental dealer (full line or non-full line) located outside the Area but competing within the Area. These were not included in the government's survey.

While there may have been some such dealers located close to the boundaries of the Area, it is very doubtful that they accounted for any significant sales to dental customers within the Area. Customers, particularly dentists, are more likely to turn to local dental dealers for their purchases rather than to those from another area. Healthco in its cross-examination of Dr. Ritchin concentrated its attempt to show omission by suggesting deficiencies as to mail order houses, those previously identified by a government witness (Mr. Walter) as competitors in the sale of dental products. No serious effort was made by Healthco to show that there were dental dealers located outside the Area which sold to dental customers within the Area. Omission of this type from the government's figures is not material.

### (c) and (d)

The third and fourth types of dental sellers can be considered together. They are (c) mail order houses based within the Area and (d) mail order houses based outside the Area but making sales to dental customers within the Area.

Mail order houses are becoming more important in the distribution of dental products and the volume of their sales of such products is ever on the increase. Through advertising in their catalogues and in trade publications, mail order houses are able to cover a broader section of the country than the full line and non-full line dental dealer who relies on local customers generated by a sales force. Moreover, the attractive credit and delivery policies once unique to the dental dealer are being offered by the mail order houses; of course, with solicitation of orders by mail and with a wider area of the country to be covered, delivery time from placement of the order to receipt of the items is probably somewhat longer for mail order houses. Larger mail order houses enjoy price advantages because of the large volume in which they purchase from manufacturers. This advantage is passed along to the dental customer. These competitive aspects of the mail order house have the greatest effect in the sundries submarket. The mail order houses are substantially equivalent to non-full line dental dealers; as already noted, the latter depend largely on the sale of sundries.

Mail order houses must be considered as included among dental sellers. The government recognized this and its sta-

tistical survey covered nine mail order houses, four based outside the Area. The sales of these mail order houses were almost exclusively confined to sundries; impact on the equipment submarket could be said to have been negligible.

The mail order houses to which the government sent questionnaires were selected in part from answers to interrogatories by Healthco concerning major competitors within the Area, and in part from interviews with dental dealers. These mail order houses, though considered competitors, never ranked higher in volume of sales than 20 on a list by sales volume of dental sellers. Only four mail order houses had sales in excess of $100,000; only these could be said to have any competitive impact in the dental products market. Three mail order houses had sales below $15,000 in each of the years surveyed; these could scarcely be considered significant competitors by any standard.

In its cross-examination of Mr. Walter and of Dr. Ritchin, Healthco showed that there were some mail order houses not included in the government's survey but which could be described as at least to some degree competitive with dental dealers. It was not shown, however, that any of these "competitors" could be considered to have any significance.

Although it appears that mail order houses selling in the Area are not completely covered by the government's statistical exhibits, the extent of any deficiency is entirely speculative and in any event seems confined to the submarket of sundries; any deficiency would have a negligible effect on the measurement of the equipment submarket.

### 15.

As already noted, the government made a special survey of the direct sales of *manufacturers* to dental customers in the Area. While the information is thus available, the government has not included it in the statistical exhibits. No reason is given for this; presumably, it is not believed that manufacturers are in competition with dental dealers. The Court has had to make its own study of the record and believes that direct sales by manufacturers are not significantly competitive with dental dealer sales.

There are over 300 manufacturers which primarily make dental products.

The major effort of these manufacturers is to sell their product lines to dental dealers and mail order supply houses, the prime channels for the resale of dental products. A survey introduced by Healthco indicated that direct sales by manufacturers to dentists for the year 1970 was only 3% of the total dental products sold to dentists. Manufacturers recognize that they need dental dealers and mail order houses as a vital part of their distribution.

Direct sales of manufacturers involve certain specialized products, such as dental waxes and laboratory furniture. The impact of direct sales of these manufacturers is on dental laboratories, government and other institutions. The impact on dentists, the chief customers for dental products, does not appear to be of any importance. Dentists require a broad line of products and the kind of services which a dental dealer offers. Direct purchases from a number of manufacturers would not be practical for dentists.

Sales by manufacturers to larger customers, institutions or government are in part aided by dental dealers who provide delivery, installation and billing services. Manufacturers which sell equipment directly do not have their own service and installation departments (at least not as a general rule).

Healthco argues that the manufacturers' role in direct sales is of crucial importance in the assessment of the breadth of the market for dental products. It argues that there are 1,000 manufacturers with a potential for direct sales within the Area. The great majority of these manufacturers, however, do not offer even token competition to dental dealers. The government surveyed 95 manufacturers from a list

based in part on Healthco's estimate of those manufacturers which it considered to be competitors in the Area. All manufacturer members of ADTA from the Area were surveyed. Mr. Ellis testified that ADTA member manufacturers account for two-thirds of the production of dental products. The government adequately covered manufacturers selling in the Area.

While manufacturers do have some impact for some specific products on those dental customers who are not dentists, it is apparent that dental dealers and mail order houses are the significant competitive forces in any relevant line of commerce. The characteristics of dental dealers and mail order houses are sufficiently alike to be considered together. On the other hand, manufacturers making direct sales of specific types of dental products to a limited class of customers, a class relatively unimportant, are not properly a part of the same grouping. The most important class of customers, the dentists, do nearly all their buying from dental dealers and mail order houses.

### 16.

■ The statistical exhibits of the government (Exs. 32–43, 45) based on the responses (Exs. 31, 31A, 44) to questionnaires (Exs. 26, 28, 30) are accepted as reasonably accurate for use in measuring the submarkets of sundries and equipment.

### 17.

The evidence for Healthco to show its measurement of the relevant market has been examined and considered. The Healthco measurement of the market relies primarily on the "Census of Business", already noted, and on the opinion and estimates of Mr. Ellis based on trade surveys and reports. Mr. Ellis estimated (SM 416) that dental purchases by active non-salaried dentists and dental laboratories within the Area were $60,200,000 for 1968, $66,100,000 for 1969, and $68,500,000 for 1970. This is to be compared with the statistical exhibits of the government (Exs. 32, 33, 34) showing sales to dental customers in the Area of $31,305,000 for 1968, $32,911,000 for 1969, and $31,600,000 for 1970. The method employed by Mr. Ellis may be arithmetically correct, but the data on which his estimates were based cannot be accepted with any confidence, for the reasons (among others) set out in the Court's opinion filed December 18, 1973. The data are taken largely from trade reports and surveys of the dental products market in which Mr. Ellis had no part; the defects in the several Healthco statistical exhibits were pointed out in the Court's memorandum opinion filed December 18, 1973.

No individual who constructed any of the trade surveys was called as a witness; the validity of the method and of the statistics could not be properly assessed. In short, the estimates of Mr. Ellis and the Healthco statistical exhibits cannot be accepted as an accurate measure of purchases of dental products within the Area.

At best, Healthco's statistical evidence and the testimony of Mr. Ellis create an inference that the government's statistical exhibits failed to give the full extent of the market, especially in respect of sales of sundries by mail order houses. The amount of any deficiency, however, is highly speculative and would not detract from the reasonable accuracy of the government's statistical exhibits.

Dr. Gould, an economic consultant witness for Healthco, was an impressive witness but his estimate of $89,200,000 as the dollar sales of "dental equipment and supplies" for 1968 in the Area is not believed to be sufficiently accurate for acceptance.

### 18.

■ Is the Area a relevant and proper "section of the country" (15 U.S.C. § 18) in which to measure the probable effects of the challenged acquisitions on competition in dental products?

Healthco's contention is that the measurement should be in the nationwide

geographic market. It contends that dental customers in the Area can and do seek dental products from nationwide sellers just as readily as they seek such products from sellers located within the Area. Reliance is again placed upon the statistical analysis of Mr. Ellis.

Healthco at the same time maintains that the Area is too broad a "section of the country" in which to measure competition amongst dental dealers. It asserts that dental dealers are strictly local and do not compete throughout the entire Area.

■ Delineation of a relevant "section of the country" for Section 7 analysis does not require a precise geographic area from which other sellers of products are totally isolated. United States v. Pabst Brewing Co., 384 U.S. 546, 549, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966). It need only be shown that the merger may substantially lessen competition in *any* section of the United States. Because a geographic market should " 'correspond to the commercial realities' of the industry and be economically significant" (Brown Shoe Co. v. United States, 370 U.S. 294, 336, 82 S.Ct. 1502, 1530, 8 L.Ed.2d 510 (1962)) rather than refer merely to geopolitical boundaries, there will be some vagueness of boundaries in any delineation.

Judge Weinfeld, in United States v. Bethlehem Steel Corporation, 168 F. Supp. 576, 602 (S.D.N.Y.1958) summarizes the matter as follows:

> "An economically significant area in an industry cannot be determined with the precision of a surveyor. In considering the anticompetitive consequences of a merger there is nothing sacred about the boundary lines of a state. The impact may manifest itself in an appreciable segment of a market which may coincide with a political subdivision of a state, a state, a combination of states or the nation."

The New York Metropolitan Area (made up of some seventeen counties, as already described) is an appropriate "section of the country" in which to study the effects of the four challenged acquisitions of Healthco.

From the point of view of full line and non-full line dental dealers the Area represents a rough approximation of the area of effective competition. The companies acquired by Healthco (except for Hebard Dental) make 99% of their sales within the Area (Hebard Dental sells 72% within the Area). Dental dealers, relying heavily on business generated by a sales force working in the field, can cover the Area. Dental dealers located at one boundary of this market are responsive to price changes (reductions) by other dealers in a different part of the Area. Smaller dealers (employing one or two salesmen) are limited to a smaller part of the Area.

Healthco has shown that mail order houses sell within the Area from other parts of the country; there is no showing that such sales are in volume sufficient to make the Area an irrelevant "section of the country" in which to analyze the mergers. While the mail order houses are competitors from beyond the Area, the overwhelmingly significant competition is from locally based dental dealers. Even if the mail order houses were a significant enough factor in competition to justify the finding of a national market, the Area would be a clear geographic submarket in which it would be appropriate to measure the effect of the mergers in question.

It is somewhat inconsistent with its "section of the country" theory for the government to include among dental sellers in the Area mail order houses from outside the Area. This does not affect the conclusion that the Area is an appropriate "section of the country". It may be noted also that the impact of mail order sales from outside the Area is insignificant as far as equipment is concerned.

Another argument for Healthco is that many dental dealers are not large enough to cover the Area; nearness of the dealer and his sales force to customers is said to be crucial. While smaller dealers are obviously limited to a seg-

ment within the Area, the four dealers acquired by Healthco were competing with Healthco in most, if not all, parts of the Area. There is no need to show that each competitor in the universe is in direct competition with every other competitor.

The Area is recognized by the Bureau of Census as a significant section of the country for measuring the sales of "merchant-wholesalers". Customers within the Area, particularly dentists, purchase the bulk of their dental products within the Area. Despite the fact that purchasers can for some products turn to sources outside the Area, its choice as a "section of the country" to which to study the anti-competitive effects of the challenged acquisitions represents a reasonable compromise reflecting the commercial realities facing purchasers and sellers.

### 19.

The test to determine whether there is a violation of the Act is the effect of the acquisition: whether it "may be substantially to lessen competition, or to tend to create a monopoly" (15 U.S.C. § 18). This effect may be studied within submarkets of the broad "line of commerce".

The government's papers occasionally refer to the probable effect on the mergers as "tending to create a monopoly"; this expression has in the past been rarely used and is little understood. The emphasis of the government's arguments was that the mergers "may substantially lessen competition".

There are four separate acquisitions here under attack, but they may be viewed in the aggregate since they are close in time, in area, and in product market. Section 7 of the Act does not require that each acquisition be examined separately; they may be evaluated for their combined effect. A discussion of the legislative history on this point, with reference to some precedents, appears in Credit Bureau Reports, Inc. v. Retail Credit Co., 358 F.Supp. 780, 794 (S.D.Tex.1971).

The submarket of dental equipment was measured to an accurate degree of reliability by the government's survey. The deficiency, if any, in the government's survey of the sundries submarket is a separate matter. As already found, the statistical exhibits for the government give an accurate view of Healthco's influence on the equipment submarket.

Healthco entered the equipment submarket in 1969 by purchasing the former outlets of S. S. White in New York City. These outlets were eleventh in the list by volume of sales of dental dealers of equipment in 1968 (Ex. 38). At the close of 1969, Healthco, after having acquired in that year the four companies noted, was first in the list by volume of sales of dental dealers of equipment, having more than four times the volume of sales as its nearest rival (Ex. 39). Healthco sold about 36–37% of all equipment sales in 1969. In 1970, Healthco's share of this market rose slightly to 38.-5% (Ex. 40).

The four acquisitions by Healthco eliminated as competitive factors in the dental equipment market the competitors ranked first, third, sixth, and eighth in list by volume of sales of dental equipment by dental dealers in 1968. Other competitors have dropped out of the dental equipment market since then. The effect of Healthco's acquisitions on competition in the dental equipment market is not subject to speculation; it has been substantially lessened. This is in a market where concentration of dental equipment sales amongst the top four, top eight and top ten competitors is heavy.

The statistical analysis of the dental equipment submarket shows that Section 7 of the Act has been violated by the four acquisitions here at issue. The analysis is supported when account is taken of the unique requirement of the dental equipment market, namely, that there be a local dental dealer who can

provide services and repairs to the customer.

■ While statistical analysis (market share, ranking, and concentration) is an important starting point in assessing the probable effects of acquisitions, "the merger must be viewed functionally in the context of the particular market involved, its structure, history and probable future". United States v. Continental Can Co., 378 U.S. 441, 458, 84 S.Ct. 1738, 1748, 12 L.Ed.2d 953 (1964)

An important ·element in the structure of any industry is the ease (or not) of entry to that industry. Healthco argues that there are relatively low barriers to entry by full line and non-full line dental dealers. Thus it contends that there is no probability that its acquisitions will lessen competition, even in the dental equipment submarket.

Entry into the equipment submarket is not foreclosed by patents or by technological reasons. There are economic barriers. Equipment product lines are not readily available from manufacturers. Equipment departments require trained specialists in the sale and servicing of equipment; in addition other managerial expertise is required.

Healthco's advantage in the Area from its control over the acquired outlets is magnified by its nationwide status as a large dental dealer.

Entry to the equipment submarket by a dental dealer selling equipment only is not economically feasible. Capital requirements in excess of $100,000 are required for a dental dealer who wishes to offer full equipment and sundries lines.

There has been no significant entry, since 1968, into the full line dealer or non-full line dealer. This has its greatest effect in the equipment submarket. While sales of mail order houses have increased, they are primarily sellers of sundries. The number of sellers of dental equipment dropped to 33 from 38 prior to the challenged acquisitions.

■ The conclusion is compelled that Healthco's four acquisitions have,

and will continue to have, the effect of substantially lessening competition within the submarket of dental equipment. Thus, there has been a violation of Section 7 of the Act.

### 20.

There is ·a different picture in the submarket of dental sundries. The influence of sales of sundries by mail order houses means that the statistical exhibits of the government are less accurate for this submarket. There are also different structural elements.

Healthco entered the sundries submarket in 1969 by acquiring Rower and its four subsidiary outlets in the Area. These together sold about $861,000 worth of dental sundries in 1968. This placed them collectively as among the top eight dealers in sundries for 1968. During 1969, Healthco acquired General (No. 5 in sundries), Sechter (No. 4), Hebard-Metro (No. 6), and Hebard Dental (No. 10). At the end of 1969, Healthco had about three times the volume of sales of sundries as its nearest rival. This remained at about the same level for 1970.

The government's survey for 1969 and 1970 showed that Healthco had 25.4% of the dental sundries market. However, there are believed to be omissions from total sales of sundries and there can be no acceptance of the statistical exhibits as showing accurately Healthco's shares of the dental sundries submarket in 1969 and 1970. The share is speculative.

As indicated, there are marked differences in the structure of the dental sundries submarket from that of the equipment submarket. Entry barriers to sell dental sundries do not appear as great. Mail order houses are recognized by dealers as an increasing force in the dental sundries submarket. No trained service force and no specialists are required in the sundries submarket. This submarket as covered by the government's survey shows no significant concentration of sellers; there are in 1970, 57 sellers in this submarket and the evi-

dence suggests strongly that mail order houses would add significantly to the number of sellers. Moreover, there has been some shift by full line dealers away from that status; for example, Dental Equipment Specialist shifted from full line dental dealer to mail order house.

In the dental sundries submarket, the share controlled by Healthco, the increasing trend of mail order houses as a competitive force in this market, and other evidence satisfy this Court that Section 7 has not been violated by the four challenged acquisitions.

## 21.

Dental equipment and dental sundries account for the great bulk of all dental products sold. The government does not contend for any effect of the challenged acquisitions on the submarkets of artificial teeth or dental precious metals.

There seems no need to consider or make separate findings as to the broad line of commerce of "dental products".

## 22.

There is a suggestion by Healthco (Post-Trial Brief, pp. 45, 46) that General and Sechter were not, when acquired "vigorous" or "formidable" competitors. This does not appear to invoke the "failing company doctrine" (Citizen Publishing Co. v. United States, 394 U. S. 131, 136, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969)), for which there is not the slightest support in the evidence. However, Healthco properly draws attention to the competitive stance of General and Sechter when acquired; this is relevant to the effect on competition of their acquisition. The facts show that General and Sechter were not on the verge of collapse when acquired but were independent competitive forces whose elimination had the effect of substantially lessening competition.

## 23.

Consideration has been given to United States v. General Dynamics Corporation, 415 U.S. 486, 94 S.Ct. 1186, 39 L. Ed.2d 530 (1974), decided while the case

at bar was under advisement. By a 5 to 4 vote, the Supreme Court held that General Dynamics did not violate Section 7 of the Act when it acquired the controlling stock of United Electric Coal Companies (United). The decision was drawn to the attention of this Court by counsel for Healthco, who stated that the "rationale and holding of the case is of central importance in the instant case".

*General Dynamics* concerned the coal industry. The government relied on statistical evidence to show that there was concentration in that industry, that the concentration was increasing, and that acquisition of United Electric would increase the market share of General Dynamics and contribute to the concentration trend. The Supreme Court majority upheld a finding of the District Court that, despite the statistical evidence, "other pertinent factors" required a conclusion that "no substantial lessening of competition occurred". These other factors were discussed but, the industries being different, no purpose would be served by analysis here.

Healthco relies on the principle and asserts that there are "other pertinent factors here". These, it says, are "dramatic changes" in the dental industry because of the increasing importance of "mail order sellers and manufacturers who make direct sales".

The difficulty is that whereas the changes in General Dynamics had already taken place and were undisputed, the changes here claimed are in the future and are speculative. There is little, if any, evidence that such changes as may occur will diminish significantly the competitive position of the full line dental dealer.

It is not believed that the *General Dynamics* decision affects any of the conclusions above stated in the case at bar.

## 24.

The effect of the four challenged acquisitions by Healthco will not substantially lessen competition in the sundries

274

submarket of the dental products industry but will substantially lessen competition in the equipment submarket of that industry. The four acquisitions are thus in violation of Section 7 of the Act.

Settle judgment on notice.